LEWIS & FIORE
225 BROADWAY, SUITE 3300
NEW YORK, NEW YORK 10007
(212) 285-2290
(212) 964-4506 (FAX)

David L. Lewis
Charles G. Fiore

August 23, 2007

**FILED ECF**

Honorable Kenneth M. Karas
United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

                **RE:  United States of America v.
                      Nathaniel Shyne
                      S4 05-CR-1067-04 (KMK)**

Dear Judge Karas:

        I write with regard to the difficult and complex task
of sentencing of Nathaniel Shyne scheduled for September 25,
2007 at 11:00 a.m.   The task is made even more complex and
difficult by the recommendation of the Probation Department
based principally on his criminal history.   Probation in its
assessment, and the Guidelines calculation in its assessment,
makes no allowance for the fact that with the exception of the
instant offense, every other piece of criminal behavior by Mr.
Shyne was tied directly to and a cause of his harrowing and
unresolved drug addiction.   That addiction, estranged him from
family and friends, was "kicked" by his own diligent work and
effort.   As described in more detail below, Nathaniel Shyne
having conquered his addiction and having found meaningful work,
was led into the instant offense by his desire to reestablish
himself with his family.   It appeared that his brother, the
family golden boy, after long absence and rejection because of
Nathaniel's drug dependency, came to Nathaniel to ask him for a
favor.   The brother, however, came back to Nathaniel, not in
fraternity as Nathaniel believed, but seeking a dupe for
criminal behavior.

Honorable Kenneth M. Karas
August 23, 2007
Page 2 of 19


**THE CRIME**

Nathaniel Shyne pleaded guilty to on count each of conspiracy to commit bank fraud under 18 U.S.C. § 1349 and conspiracy to launder funds, under 18 U.S.C. § 1956(h). He has been incarcerated for two years since his arrest on these charges on August 30, 2005. Count I charged a wide ranging conspiracy over three years in which the principal actor was Nathaniel Shyne's brother Douglas and others of Douglas' immediate and extended family, none of whom had prior convictions to this defendant. Count 14 charges that this defendant and his brother, along with others from June to August of 2005, committed bank fraud knowing that the transactions, the moving of money from checks to accounts and then withdrawing a portion of the money, was designed to conceal and disguise the original proceeds' source and truthful ownership. Nathaniel in each of the events in this case in which he played a role either used his own personal bank account or permitted another person to use it. Nathaniel made no attempt to conceal his involvement. He did not use a false identity or act in any way to conceal his own actions and deeds.

Mr. Shyne seeks a horizontal departure as to his Criminal History Category so as to obtain a sentence of 33 months.

**THE DEFENDANT**

Nathaniel Shyne has had a wretched life, much of his own making and his own weakness. He had the opportunity to take his life back from the ravages of addiction and petty theft. He did it. He had the opportunity to return to his family and achieve what eluded him - acceptance. He sought approval and acceptance and never received it. He believed that he was not the Golden Boy that his brother was. So when the Golden Boy deigned to return to Nathaniel and shine his light on him, old habits die hard. The desire for lost and sought after approval presented itself. Nathaniel could be loved and approved by

Honorable Kenneth M. Karas
August 23, 2007
Page 3 of 19

Douglas, the last of the Shyne brothers and the blessed brother.
And like most who seek love where it is not, he made a mistake.
He allowed his own bank accounts to be used.  He exposed himself
in his own name to whatever would happen.  He relied first on
Douglas' assurances and then disquieted by what was going on,
relied on the idea that love from his brother was more valuable
than his own self.  The weaknesses that led to alcohol and
drugs, now posed as the devil's last deceit, family loyalty, to
allow Nathaniel to disguise what he had to know was criminal
behavior by the brother who in the family myth could do no
wrong.  Once again Nathaniel Shyne has learned the hard way.
Now he faces the Court, with nothing left but his sordid past of
drugs and theft which he has struggled and grown to put behind
him and with no support from a place that should have and should
be giving it, his family.  Sometimes it is not that the
defendant is unlovable, it is that there is no one there to love
him.  In Nathaniel's case, only the people of Project Renewal
and a cousin have sought to know how he is and what he needs.

        Nathaniel Shyne fell into heroin addiction.  He
drifted from "fix" to "fix".  He supported his habit by petty
theft, shoplifting from stores. It was not who he really wanted
to be, but it was who he had become.

        Drug addiction has its own rules and recovery requires
a certain intensity and commitment.

        Finally, Nathaniel Shyne found his way to Project
Renewal, where he could recover from his addiction.  After a
long struggle with himself, he was successful.  Once he
recovered the Project wanted to support Mr. Shyne.  So it went
from helping him to employing him.  He was hired as a
maintenance man for them at minimal wages.  With a job, he made
a permanent home for himself renting a room, paying rent and
rejoining society.  His recovered self longed to reconnect with
his birth family so when his brother sought him out he was
pleased to renew contact with his brother because Nathaniel

Honorable Kenneth M. Karas
August 23, 2007
Page 4 of 19


Shyne was proud of what he had finally accomplished, a drug free life.

The rehabilitation of a drug addict by his act of will is no mean accomplishment. Because of it, society has regained a productive citizen.  It appears society has nothing to fear from him, as it seems most unlikely he will now throw away his rehabilitation and return to drugs.  United States v. Rodriguez, 724 F.Supp. 1118 (S.D.N.Y. 1989).

**THE PLEA OF GUILTY**

Nathaniel Shyne pleaded guilty to Counts 1 and 14 pursuant to an agreement, the terms of which are fully described in the PSR.  The principal difference in this plea agreement from so many others is that both sides have agreed to present to the Court the issue of whether or not pursuant to U.S.S.G. § 4A1.3 (b), the criminal history score of VI substantially overstates Mr. Shyne's criminal record and criminal behavior. The Government and the defense agreed that the defendant would be able to seek a downward departure from the stipulated range on the basis that stipulated criminal history category overstates the nature and the quality of his criminal past and that a fairer representation, according to the defense would be a Category IV

Pursuant to the agreement, the defendant's offense level was agreed to be an offense level of 16.

As part of the plea agreement the defendant agreed that the calculated Criminal History score was 23 leading to a Criminal History Category of VI.

The range under the Guidelines would be 46-57 months.

Were the Court to grant the downward departure to a Criminal History Score of IV then the result would be a range of 33 to 41 months.

Honorable Kenneth M. Karas
August 23, 2007
Page 5 of 19


**OBJECTIONS TO THE PSR**

        The defendant objects to certain of the statements in
the PSR, as well as the recommended sentence.  The defendant
also vigorously objects to the sentencing recommendation as
heartless and unnecessary punitive so as to be a sentence
greater than necessary and a product of the overstated criminal
history category assessment.

        The defendant objects to Paragraph 13 insofar that it
relies upon a referenced but not shown "computer inquiry" of BOP
records indicating no verification of the alleged information.
Further, there is no means to ascertain whether and what a
sanction for non-criminal phone abuse is and was.  There is no
indication if there was a hearing or due process on this
allegation.  Because it could prejudice the defendant in his
security assignment in the BOP, the defense moves for the last
sentence of Paragraph 13 to be stricken.

        The defendant has no knowledge with regard to the
material contained in the paragraphs that do not mention him
with the exception of the familial relationship he has with
Douglas Shyne and Douglas' common-law-wife.

        Paragraph 99 and 100 recite that Natasha Singh
deposited $180,000 in a single counterfeit check in Nathaniel
Shyne's account.  Of the $180,000, two checks were issued,
according to the PSR the next day by Shyne himself in the total
amount of $135,000, which she put in her account leaving Shyne
with $35,000.

        Paragraph 125 indicates that "approximately" six
checks were deposited in Nathaniel Shyne's back account.  They
were issued to him and totaled the amount of $21,850.

        Each of the acts of Nathaniel Shyne involved
depositing of the questionable checks into his own personal bank

Honorable Kenneth M. Karas
August 23, 2007
Page 6 of 19

account in Bank of Commerce.  He made no effort to hide the
checks or the deposits, although it is clear that he had no
reason to obtain these amounts of money.

        In fact, the bank shut down Shyne's account because of
the unusual activity given the amounts were out of phase with
anything Mr. Shyne ever had or put into the bank.

        Although Mr. Shyne retained little or none of the
proceeds of the fraud, Probation charges that he should be held
to a restitution amount of $201,850 despite the fact of that
money, $135,000 went in and out of his account to Natasha Singh.
Therefore, we object to the victim impact as delineated in
Paragraph 127 since it overstates the victim impact.  Put
simply, the same amount of money can only be stolen once in the
fraud by Mr. Shyne.

        The defendant objects to the allegation in the PSR
Paragraph 175 that claims that the defendant injured three
guards during an attempted shoplifting when, in fact, he was not
prosecuted for it, the final disposition only revealed petit
larceny and the term injured is merely prejudicial and not
informative since no assault charges were instituted or docketed
as Mr. Shyne.  Along with the prejudice of listing arrests, the
un-pursued allegations are not even reliable for usage during
sentencing.

**NATHANIEL SHYNE'S CRIMINAL HISTORY**

        Counsel does not and cannot challenge the computation
under the Guidelines.  No minor mathematical error would alter
the results.  In what can fairly be characterized as an amazing
set of pages, Mr. Shyne, while under the influence of and while
addicted to narcotics, managed to get himself arrested and
convicted of misdemeanor offenses on a regular basis.  The
government and defense counsel totaled up the criminal history
and obtained and agreed to a calculation of the defendant's
criminal history points indicating a Category VI, based upon a

Honorable Kenneth M. Karas
August 23, 2007
Page 7 of 19


total number of points of 23.  Probation totaled the number of
points as 30.  In either case, under any interpretations of the
Guidelines or any mathematical computation of relevance, the
defendant ended up in Category VI.

     The PSR lumps initially and at the close arrests of
the defendant with the later convictions.  It also, at some
juncture, recites uncritically the fact that the arrest report
reports (but does not charge) higher degrees of criminality than
those that were actually charged against the defendant.  Where
the arrest report contains an allegation of criminality, it is
unsworn and unvetted by anyone but the officer copying what he
is told.  It should not be used in a PSR.  In the case of the
charging instrument, that piece of paper is in fact sworn to
under oath and usually is hearsay, based upon an officer's
taking of a statement from a person claiming to be a victim.
That document must be corroborated by an affidavit.  Where it is
not, the charges are dropped.  Where the instrument is
corroborated, then the matter is an actual criminal complaint
fully judiciable in the courts of the State of New York.  Felony
complaints must produce indictments or agreements to plead by a
Supreme Court information.  The PSR lumps all the arrests, the
complaints corroborated or not, and other activity together.
While this does not impact on the number of criminal history
points the defendant has incurred, it informs the veracity and
reliability of the unverified nature of some of the statements
in the PSR.

     Probation reports that for the ten years between 1982
and 1992 the defendant amassed 45 prior arrests.  Not every
arrest resulted in a conviction.  The PSR states without being
concise that these prior arrests result in numerous convictions
leaving the implication that many of them did not result in
convictions.

     The crimes of conviction include the classic drug
offender larceny and criminality tied to the need to obtain the
items of addiction without resort to violence.  They include

Honorable Kenneth M. Karas
August 23, 2007
Page 8 of 19


Petit Larceny, Theft of Services, Criminal Trespass, Disorderly
Conduct Jostling, Criminal Possession in the lowest degree of
drugs, Shoplifting, Sale of Methadone and the like.

        While the PSR is studiously silent on interpreting the
cycle of crime, despite the eliciting of the requisite
information, and in its recommendation seems to punish the
recovered addict as if he still is an addict.  The defendant's
criminal history reveals a life that from the age of 25 to 35 at
least, the defendant was mired in a cycle of addiction and
misbehavior on the minor end of criminal activity.  The PSR is
silent on the disposition of these offenses but as demonstrated
by much of the rest of Mr. Shyne's record, no services, no
rehabilitation and no attempt to move him from the cycle of
addiction and crime to any other positive action occurred in the
NYC Criminal Justice System.

        The PSR only reports dispositions of course as a means
to total up criminal history points in the Guidelines
assessment.  Therefore, it demonstrates that the convictions for
petit larceny and possession of stolen property get sentences of
a few months in custody, all arise out of shoplifting in
department stores.  See Paragraphs 146, 148, ($392 in
merchandise), 150 (25 bottles of perfume), 152, 154, 156, 158,
160, 162 ($104), 173, 175.[1]

        His prior felony was in 1997 when he pleaded to
attempted burglary in the third degree for removing property
from a store without paying for it at four o'clock in the
afternoon.  He did a year, was paroled, which was revoked for
taking property without paying for it twice (Paragraph 167 and

---

[1]     This arrest described at Paragraph 174 states that the
defendant "injured three guards in the process". The disposition
is confined to petit larceny. This casts grave doubt on the
allegation of injured guards especially since there was no
prosecution for the injury to anyone.

Honorable Kenneth M. Karas
August 23, 2007
Page 9 of 19


169 ($115)).  He received no treatment for addiction in the New York State prison system.

As part of the anti-shoplifting initiative, the stores in conjunction with certain courts began to serve defendants in such cases with notices regarding the fact that their reappearance would be trespass, in effect banning them from the otherwise public commercial establishment.  This apparently is what is referenced in the PSR Paragraph 170 and 171.  The PSR improperly listed the arrest report charges which were not even the ones brought against the defendant in court (See Paragraph 171).  The defendant requests that the sentence reading, "The charges as listed on the arrest report. . ." be stricken.

**OBJECTIONS TO THE USE OF PRIOR ARRESTS**

As discussed above and as demonstrated by Paragraphs 179-182, pursuant to United States v. Miller, 263 F.3d 1 (2d Cir. 2001), Mr. Shyne specifically objects to any use of his prior arrests as delineated either clearly or in a muddled fashion as regards any determination as to a downward departure on the basis of U.S.S.G. § 4A1.3.  The use of a prior arrest record, in whole or in part as a basis for refusing to depart downward, may be error, but only if the defendant objects to it in the District Court.  The defendant in this case specifically objects and insists that even after Miller, it is error for a sentencing court to deny a downward departure on application under U.S.S.G. § 4A1.3.  The Policy Statement discussing the departure upward or downward indicates that in accepting the departure, any prior arrest record itself shall not be considered in terms of U.S.S.G. § 4A1.3.  While Miller refuses to hold that the use of the record is plain error, it offers a surprisingly weak argument that the arrest record prohibition is only in the context of upward departures.  The Court's reasoning in Miller is exactly the type of exegesis frowned on when done on behalf of a defendant.

Honorable Kenneth M. Karas
August 23, 2007
Page 10 of 19


**THE PSR OVERLOOKED THE MOST SALIENT ASPECT OF THE CRIMINAL
HISTORY AND THUS TAINTED THE RECOMMENDATION**

Nathaniel Shyne's last involvement with the criminal
justice system before this case was July of 2003.[2]  He was
sentenced to nine months of custody and was released on
September 10, 2002.

After this incarceration, again for drug related
shoplifting and theft, Nathaniel Shyne at 46 was motivated,
driven and shamed into facing the issue of addiction and trying
to seek a road to recovery.  The defendant had been severely
addicted to drugs and to alcohol.  His life led him to minor and
petty thefts from stores as a shoplifter.  He had and never had
or used a weapon.  He did not engage in violent behavior.  He
stole or tried to steal relatively small amounts of property.
Sometimes he was charged with petit larceny and once he was
convicted of burglary for theft in broad daylight from a store
but all the acts were shoplifting.  It was this life that was
the totality of his life of crime.  He recovered from his
addiction.  He rehabilitated himself to the point where he was
clean of drugs and alcohol, maintained a job, participated in
ongoing recovery work and renewed family relationships.
Nathaniel Shyne until Douglas Shyne asked him for his help in
the instant criminal scheme, had foresworn the drugs and alcohol
and the things that drove him to the crimes that he committed.

While the PSR does relate Mr. Shyne's life story in
brief, it accepts at face value his understanding of his growing
up and events in the home, without making a stab at analyzing
the impact of such things in the house on the children that live
in that environment.  Knowing no other childhood, it is not
surprising that the defendant characterizes it as "pretty
decent".

---

[2]    He received 2 extra criminal history points because he
committed the instant offense within two years of his custody
terminating on the last offense (PSR Paragraph 177).

Honorable Kenneth M. Karas
August 23, 2007
Page 11 of 19


**APPLICATION FOR DEPARTURES**

Even in the post-Booker world, the defendant may seek departures in order to ameliorate the impact of 18 U.S.C. § 3553 (a) (4), which requires consideration of what would have been the mandatory Guideline sentence.  While there is no presumption of regularity mandated in the Guidelines computation, Rita v. United States, ___ U.S. ___ ; ___ S.Ct. ___, 2007 WL 1772146, this Circuit has played tug of war with the meaning of non-mandatory nature of the Guidelines.  See United States v. Rattoballi, 452 F.3d 127, (2d Cir. 2006) suggesting that the consideration of departures remains as significant as the computation of the adjusted base offense level and computation of the criminal history category.

Departure downward from the applicable Guideline range is permitted if the court finds that there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines, so that it results in a sentence different from that described by the process.  United States v. Koon, 518 U.S. 81, 92 (1996).

Under 18 U.S.C. § 3553(b), the sentencing court is authorized by Congress to depart from an applicable sentencing range in cases where there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in the formulating of the guidelines, so as to result in sentence different from that described.  The Commission itself acknowledged by the promulgation of U.S.S.G. § 4A1.3 (b) that courts should consider departing from the guidelines where "reliable information indicates that the criminal history category substantially over represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  The Commentary to § 4A1.3 offers an example of when a downward departure may be warranted: "[I]f for example, the defendant had two minor misdemeanor convictions close to ten years prior to

the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. § 4A1.3 n. 3.

Nathaniel Shyne moves for a downward departure on the basis that the criminal history category "substantially over represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes U.S.S.G. § 4A1.3 (b)(1). Courts in this Circuit have departed downward under the authority of U.S.S.G. § 4A1.3 where the criminal history generates a category greater than the sum of its parts. Where petty criminality is associated with the addict's attempt to get money to buy drugs, there has been a departure. United States v. Hammond, 37 F.Supp. 204, 205 (E.D.N.Y. 1999). Where the sentences have been just long enough to trigger accumulation of criminal history points then there has been a departure. See e.g. United States v. DeJesus, 75 F.Supp.2d 141, 143-44 (S.D.N.Y. 1999).

Fundamentally, Nathaniel Shyne's criminal history and likelihood of recidivating, differ significantly from the typical offender for whom the Sentencing Commission formulated the Criminal History Category of VI, which does not adequately reflect the seriousness of the defendant's past-criminal conduct. Thus, the Commission set out the parameters of the existence of a place outside the heartland. The district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. The departure sought in this case from Criminal History Category VI to IV is often referred to as a horizontal departure from the fact that it slides along the horizontal axis of the Guidelines grid.

**HORIZONTAL DEPARTURE**

The issue for Mr. Shyne is one where justice must act to distinguish between the vicious and the unfortunate. The assessment under U.S.S.G. § 4A1.3 (b) is tied to two independent but integrated assessments. The first is whether the criminal

Honorable Kenneth M. Karas
August 23, 2007
Page 13 of 19


history over represents the defendant's criminal acts and
behavior. The second is whether it over estimates the
likelihood of the defendant committing crime again. Either of
the two or both justify in the case of Mr. Shyne a horizontal
departure.

        The criminal behavior of Mr. Shyne overstates his
history so as to expose him to punishment as is demonstrated by
the PSR calculation and assessment, far in excess to what is
necessary thus violating the parsimony clause. The Circuit
Court has stated that this type of departure is most frequently
used when a series of minor offenses often committed many years
before the offense results in a criminal history category that
overstates the seriousness of the defendant's record. United
States v. Carrasco, 313 F.3d 750, 767 (2d Cir. 2002).

        In assessing this defendant's life, the district
courts assess a variety of issues. The case closest to that of
Mr. Shyne's is United States v. Eisinger, 321 F.Supp.2d 997
(E.D. Wis. 2004). There, the defendant had a criminal history
that was elevated by the fact that there were multiple
convictions for shoplifting, and drug possession. The court
held that the criminal history category significantly
overrepresented the defendant's criminal record because this
defendant's rap sheet was "not the sheet of the usual occupant
of [the category]". The court determined that the defendant's
criminality did not reveal a propensity for dangerousness or a
willingness to hurt others, but rather was the result of a time
when the defendant was a drug addict. In a similar vein, an
assessment that the criminal behavior involves relatively minor
offenses, that none involved actual violence ad were the fruit
of substance abuse that has now been ceased. See United States
v. Hammond, 240 F.Supp.2d 872 (E.D. Wis. 2003); United States v.
Hernandez, 2005 WL 1423276 (S.D.N.Y. 2005). The criminal
behavior in the past and the present matter should not be
condoned or minimized. The criminal record of Mr. Shyne is not
as serious as the crimes that put many of the other defendants
in Category VI. See e.g. United States v. Anderson, 955 F.Supp.

Honorable Kenneth M. Karas
August 23, 2007
Page 14 of 19


935 (N.D. Ill 1997).  Additionally, where the defendant was
basically a decent person whose entire criminal past was tied to
becoming involved in drug use, involved what appeared to be
impulsive substance related behavior, the criminal history
category, in reliance on the repeated albeit minor convictions,
boost a minor criminal record into the highest category by sheer
numerosity rather than criminality.  It produces a draconian
sentence that disserves the interest of justice and society
because the defendant is drug free, contrite for his criminal
behavior, and a good prospect for reform and rehabilitation.
See e.g. United States v. Hughes, 825 F.Supp. 866 (D Minn.
1993).

       The facts of the defendant's cases, i.e., the amounts
shoplifted or attempted to be taken, the fact of his drug
addiction and his recovery as demonstrated by the fact that his
post-arrest testing confirmed his liberation from drug use, all
provide reliable information that Category VI overstates the
defendant's actual criminality.  The Criminal History Category
of VI failed to make a distinction so necessary for sentencing
between severity of criminal acts and the dangers posed by
particular criminals who earned the Category VI designation.
See United States v. Carvajal, 2005 WL 476125 (S.D.N.Y. 2005).
The Court may conclude that the defendant's criminal history was
significantly less serious than those of most defendants in the
same criminal history category and therefore, it considers a
downward departure from the Guidelines.  U.S. Guidelines Manual
§ 4A1.2.  The Guidelines, by their terms in this particular area
and with the advent of United States v. Booker, 543 U.S. 220
(2005), make it clear that they are not be applied in a
mechanistic fashion, wholly ignoring fairness, logic and the
underlying statutory scheme which provides for specific
departure as a relief from the numerical scores.

       The next issue is whether this defendant truly is
appropriate for a Category VI.  The courts look to whether the
crimes of conviction are those of violence to determine if the
defendant is someone with a succession of violent crimes and

Honorable Kenneth M. Karas
August 23, 2007
Page 15 of 19


multiple lengthy sentences so as to justify placement in highest
category as Mr. Shyne has been placed. See e.g. United States
v. Wilkerson, 183 F.Supp.2d 373 (D Mass. 2002). Despite the
fact that the violent or non-violent issue is a far greater
predictor of recidivism and means for evaluating culpability, it
is not reflected in the criminal history score. Mr. Shyne has
no actual charging documents that indicate any violence. The
sole arrest that contains a claim of harming three security
guards was on the arrest report, but not charged in any respect.
To that extent, the fact that it was a claim at the time of the
arrest, but not pursued by the authorities who decided whether
or not it was a provable allegation, makes it less than reliable
information and should not be used to assess that Mr. Shyne
engaged in violent conduct. Thus, a defendant with multiple
violent crimes and multiple incremental sentences would be the
person for whom this level of incarceration would be reasonable,
defies the same application to this defendant. Unless each
person is no more than a point on a grid, then this defendant's
criminal history score overstates his criminal past.

        The criminal history score mirrors disparities in the
state system and magnifies criminal behavior without regard to
the state assessment of such activities.

        The second basis for departure is that the U.S.S.G.
calculation significantly over represents the seriousness of the
defendant's criminal history. Under the Guidelines, criminal
history does not attempt to gauge the seriousness of the crime
of conviction; rather it "'estimates the likelihood of
recidivism.'" United States v. Morris, 350 F.3d 32, 37 (2d Cir.
2003) (quoting United States v. Campbell, 967 F.2d 20, 24-25 (2d
Cir. 1992)); see generally U.S.S.G., Ch. 4, Pt. A, Intro. Comm.
(discussing relevance of prior criminal history to factors set
forth in 18 U.S.C. § 3553(a)(2)). The U.S. Sentencing
Commission issued a Policy Statement regarding the adequacy of
determining a defendant's criminal history category, stating
that there may be cases where the Court concludes that a
defendant's criminal history category significantly over

Honorable Kenneth M. Karas
August 23, 2007
Page 16 of 19


represents the likelihood that the defendant will commit further crimes, i.e., recidivate. The facts and circumstances of the instant criminal behavior indicate that the defendant is highly unlikely to recidivate. Remorseful and in despair of the loss of all that he had fought so hard to gain, Nathaniel Shyne will not engage in criminal behavior. The loss of trust in close family members is painful but not as much as being back in jail. He has fought his way out of a life of addiction and squalor. The ability to do something to re-earn his brother's love and affection was itself a one time life event. Having overcome his physical weaknesses, he has not overcome his emotional weaknesses by facing what his brother did to him, Nathaniel Shyne takes full responsibility for what has done. With full awareness and complete contrition, he is less likely to commit another crime than many others. He knows too well what he has had and lost.

        U.S.S.G. § 4A1.3 affords the sentencing court discretion to depart downward in this type of case. This Circuit has required that the sentencing court set out its specific reasoning. United States v. Butler, 954 F.2d 114, 121 (2d Cir. 1992). The Commission has suggested departures in situations where minor criminal cases generate greater than necessary sentences. This Circuit has required that such departures based upon over statement of criminal history procedurally be accomplished by the court proceeding sequentially from the defendant's criminal history category to the next, pausing at each step to consider whether that category in particular, adequately reflects the seriousness of the defendant's record. United States v. Khalil, 214 F.3d 111, 123 (2d Cir. 2000).

**WHO IS HE REALLY?**

        Nathaniel Shyne is a man who has tossed away most of his life and only before the arrest in this case regained it only to have it slip away. When it first eluded him, he descended into a life of drug addiction and petty theft. His

Honorable Kenneth M. Karas
August 23, 2007
Page 17 of 19


final achievement was to clean himself up, go from patient at
Project Renewal and then to be employed there.  He had begun to
put the pieces together.

        Robert Doyle paints a picture of life before the drug
addiction and Nathaniel Shyne's life after.  Through the church
and other areas, Mr. Doyle found that Mr. Shyne was willing to
go back to the old neighborhood to try to convey an image of
life without violence and drugs.  It seems Mr. Doyle's
redemption embraces his forgiveness and affection for Mr. Shyne.
(Exhibit A).

        Brian Thorman also wrote for Mr. Shyne.  He was
involved in trying to help Mr. Shyne when he was first arrested
and has been in constant conduct with the office asking about
and trying to look after Mr. Shyne's welfare.  It is Mr. Thorman
who cues the Court to the fact that "only recently" have they
begun to tighten their family bonds.  Mr. Thorman also allows
the Court a look at Mr. Shyne when not in the throes of or
subject to the life of addiction.  He states that Mr. Shyne went
to the Thorman boy's football games, advised him as a young man,
to make intelligent and just decisions, to have morals and
dignity (Exhibit B).  For Nathaniel Shyne it was a demonstration
of what he wanted he himself to be and could not achieve it.
Inculcating it in his nephew may have been the closest that
Nathaniel Shyne could rescue someone, if not himself.  According
to Mr. Thorman, Nathaniel Shyne was successful with his young
cousin, when he could not do it for himself.

**NATHANIEL SHYNE DESERVES THE SOUGHT AFTER DEPARTURE**

        The Supreme Court wrote in <u>Koon</u> the basis of
sentencing under the Guidelines is fundamentally the same
assessment delegated to the judiciary from the very first moment
man moved from mob justice inside into rooms with the signs and
symbols of rationality:

Honorable Kenneth M. Karas
August 23, 2007
Page 18 of 19


      This too must be remembered, however. It has been
uniform and constant in the federal judicial tradition
for the sentencing judge to consider every convicted
person as an individual and every case as a unique
study in human failings that sometimes mitigate,
sometimes magnify, the crime and the punishment to
ensue. We do not understand it to have been the
Congressional purpose to withdraw all sentencing
discretion from the United States District Judge.
Discretion is reserved with in the Sentencing
Guidelines and reflected by the standards of appellate
review adopt[ed]. <u>Koon</u>, <u>Id.</u>

      Once before there were Guidelines, there was more
innate wisdom in the sentencing of individual human beings. The
fight was not a measuring of pints and an assessment of levels
as the base line evaluation of a human being. We saw people for
their frailties and their possibilities. After <u>Booker</u>, we have
the ability restored to us to do this work of reclaiming the
human self after criminal behavior. We also have the ability
not to seek to find a way out of the mythical and ever growing
and expanding heartland, but the opportunity to find the heart
of a person, to weigh and make judgments which are laden with
authenticity and not authority.

      Before Probation became a force for imprisonment and
not for rehabilitation, and since they make little difference in
terms of their reports since <u>Booker</u> was decided, acting as if it
is not for them really to play a role in all the 18 U.S.C. §
3553 (a) factors, it is left to the judge to find those worthy
of redemption.

Honorable Kenneth M. Karas
August 23, 2007
Page 19 of 19


**THE PROPOSED SENTENCE**

        We respectfully request that the Court reject the
draconian recommendation of the PSR, but instead grant the
departure to Criminal History Category IV and sentence the
defendant to 33 months.

                            Respectfully yours,


                            _____
                            DAVID L. LEWIS
DLL/bf
cc:  E. Danya Perry (via ECF and regular mail)
      Assistant United States Attorney
      Sara K. Anderson (via regular mail)
       United States Probation Officer
      Nathaniel Shyne